J-A18006-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| PATRICK CLEMMONS AND MELISSA CLEMMONS (H/W) | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 1426 EDA 2024 |
| RANDY LEHR, AND ECORE INTERNATIONAL, INC. | : | |

Appeal from the Order Entered September 9, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 200600478

| | | |
|---|---|---|
| PATRICK CLEMMONS AND MELISSA CLEMMONS (H/W) | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RANDY LEHR, AND ECORE INTERNATIONAL, INC. | : | |
| | : | No. 1475 EDA 2024 |
| | : | |
| Appellants | : | |

Appeal from the Judgment Entered September 9, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 200600478

BEFORE: OLSON, J., DUBOW, J., and BECK, J.

MEMORANDUM BY OLSON, J.: **FILED FEBRUARY 27, 2026**

This is a consolidated appeal in which Appellants, Patrick Clemmons and Melissa Clemmons (collectively, the "Clemmons"), appeal from the September 9, 2024 judgment entered in the Court of Common Pleas of Philadelphia County, following a jury trial. The Clemmons argue that the trial

court erred or abused its discretion in reducing the jury's punitive damages award against Ecore International, Inc. ("Ecore") from $25,000,000.00 to $1,000,000.00. For their part, Appellees/Cross-Appellants, Randy Lehr and Ecore, cross-appeal from the September 2024 judgment, arguing that the Clemmons failed to demonstrate entitlement to any punitive award and alternatively, that the trial court correctly reduced the jury's punitive damages award but should have reduced it further to reflect a one-to-one ratio. For the reasons that follow, we affirm, in part, vacate, in part, and remand for proceedings consistent with this memorandum.

The trial court summarized the relevant facts and procedural history of this case as follows.

> This case arose from a tractor[-]trail[er] accident just a few minutes after midnight on December 2, 2019. Patrick Clemmons's . . . tractor-trailer was parked on the shoulder of the highway when . . . [Mr.] Lehr, who was also driving a tractor-trailer, lost control of [his tractor-trailer] and veered off the travel lane, crashing into [Mr. Clemmons's] parked [tractor-]trailer. [Mr. Clemmons] was severely injured as a result of the crash, suffering traumatic brain injury and damage to his spinal column. A jury trial was held . . . from September 5, 2023[] through September 18, 2023.
>
> The jury returned a verdict in favor of [the Clemmons] and against [Mr. Lehr and] Ecore . . . awarding [the Clemmons $1,200,000.00] in compensatory damages. More specifically, the jury awarded [Mr. Clemmons $300,000.00 in economic damages and $200,000.00 in non-economic damages. The jury also awarded $700,000.00 to Mrs. Clemmons for loss of consortium. Finally, the jury returned] punitive damages [awards] of $2,500[.00] against [Mr.] Lehr and $25,000,000[.00] against . . . [Ecore].
>
> On September 25, 2023, [the Clemmons] filed a motion for delay of damages, followed by a motion to mold the verdict on

- 2 -

> September 28, 2023. Also, on September 28, 2023, [Mr. Lehr and Ecore] filed [a] post-trial motion seeking judgment notwithstanding the verdict (hereinafter[,] JNOV), a new trial on all issues, a new trial on damages, or a remittitur.
>
> On March 28, 2024, [t]he [trial] court granted[,] in part[,] and denied[,] in part[, Mr. Lehr's and Ecore's] post-trial motion, reducing the punitive damages award [against Ecore] to $1,000,000.00[.] … [The Clemmons'] motion for delay of damages was granted on April 15, 2024, and the verdict was molded to reflect both the delay damages and the reduced punitive damages award for a total [recovery] of $2,259,092.46 to be entered against [Mr. Lehr and Ecore]. On April 29, 2024, [the Clemmons'] motion to mold the verdict was deemed moot.
>
> [The Clemmons] filed an appeal on May 16, 2024[. Mr. Lehr and Ecore] filed a cross-appeal on May 30, 2024. The parties were directed to file a [concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The parties timely complied].

Trial Court Opinion, 8/22/24, at 1-2 (unnecessary capitalization omitted) (paragraph break inserted).

The Clemmons raise the following issues for our consideration:

1. [Did the trial court err in concluding that the original punitive damages award against Ecore of $25,000,000.00 violated due process?]

2. Did the trial court abuse its discretion or commit an error of law [in reducing the jury's punitive damages award] against Ecore from [$25,000,000.00] to [$1,000,000.00], given the evidence of Ecore's and [Mr.] Lehr's misconduct in the trial record and viewing that evidence in the light most favorable to the [Clemmons]?

***See generally*** Clemmons' Brief at 3.

By way of cross-appeal, Mr. Lehr and Ecore raise the following issues for our consideration:

1. Did the trial court correctly exercise its discretion and rule in accordance with the law in granting remittitur as to the gross[ly] excessive punitive damages verdict?

2. In the alternative, did the trial court err and/or abuse its discretion in applying a constitutionally impermissible multiplier to calculate the reduced punitive damages award?

3. Did the trial court err and/or abuse its discretion in denying [Ecore's] motion for [JNOV] regarding [the Clemmons'] punitive damages claim because [the Clemmons] failed to present a *prima facie* case showing entitlement to punitive damages?

Appellees/Cross-Appellants' Brief at 7.[1]

On appeal, the parties challenge the trial court's April 9, 2024 decision regarding Mr. Lehr and Ecore's post-trial motion. To recount, the trial court, in its order, denied Mr. Lehr and Ecore's motion for JNOV, concluding that the evidence and testimony established reckless conduct on the part of both Mr. Lehr and Ecore, thereby supporting its assessment that the issue of punitive damages should have been submitted to the jury. The trial court, however, considered the $25,000,000.00 punitive damages award to be unduly excessive and, as such, violative of due process. Thus, the trial court held that, "[i]n the interest[] of justice" as well as "constitutional considerations," it was "compelled to intervene" and remit the punitive damages award from $25,000,000.00 to $1,000.000.00. Trial Court Opinion, 4/9/24, at 11.

_____

[1] We have reorganized Appellees/Cross-Appellant's issues presented on appeal for ease of discussion and disposition.

## CLEMMONS' APPELLATE ISSUES

We will consider first the Clemmons' appellate claims. Initially the Clemmons argue that the trial court erroneously considered the original $25,000,000.00 punitive damages award to be unduly excessive and, thus, violative of due process. We begin our analysis by recounting the purpose of punitive damages, which our Supreme Court recently outlined as follows:

> "Punitive damages have long been a part of traditional state tort law." ***Silkwood v. Kerr-McGee Corp.***, 464 U.S. 238, 255 (1984). The common-law method for assessing punitive damages has been recognized in every state and federal court for over two hundred years—since before enactment of the Fourteenth Amendment in 1868. ***Day v. Woodworth***, 54 U.S. 363 (1851); [***Pacific Mut. Life Ins. Co. v. Haslip***, 499 U.S. 1, 17 (1991)]. Punitive damages "are aimed at deterrence and retribution." [***Cooper Industries, Inc. v. Leatherman Tool Group, Inc.***, 532 U.S. 424, 432 (2001)]. They have been described as "quasi-criminal," ***Haslip***, 499 U.S. at 19, and could be described as "private fines" intended to punish the defendant and to deter future wrongdoing. ***Leatherman***, 532 U.S. at 432. "A jury's assessment of the extent of a plaintiff's injury is essentially a factual determination, whereas its imposition of punitive damages is an expression of its moral condemnation." ***Id.***; ***see also Gertz v. Robert Welch, Inc.***, 418 U.S. 323 (1974) ("[Punitive damages] are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence."); ***Haslip***, 499 U.S. at 54 (O'Connor, J., dissenting) ("[P]unitive damages are specifically designed to exact punishment in excess of actual harm to make clear that the defendant's misconduct was especially reprehensible.").

***Bert Co. v. Turk***, 298 A.3d 44, 58–59 (Pa. 2023) (parallel citations omitted).

Although the foregoing passage acknowledges the legitimate and long-standing role punitive damages play in state tort law, excessive punitive

damages awards raise constitutional concerns. *See also Hollock v. Erie Ins. Exchange*, 842 A.2d 409, 420 (Pa. Super. 2004) ("While a decision to punish a tortfeasor by exacting punitive damages is an exercise of State power, it must nevertheless comply with constitutional due process concerns." Hence, "due process requires judicial review of the size of punitive damage awards."). Indeed, the United States Supreme Court has instructed that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him [or her] to punishment, but also of the severity of the penalty that a State may impose." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574 (1996). The Due Process Clause of the Fourteenth Amendment, therefore, operates to prohibit "the imposition of grossly excessive or arbitrary punishment on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). Thus, courts "must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Id.* at 426; *see also id.* at 419-420 (instructing courts to go "no further" than a "more modest punishment" for the subject "reprehensible conduct" in order to "satisf[y] the State's legitimate objectives" of punishing and deterring future wrongdoing).

To determine whether a punitive damages award comports with due process, a court must "consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages

award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418, *citing **Gore***, 517 U.S. at 575. We review *de novo* the jury's $25,000,000.00 punitive damage award by applying each of these guideposts to the instant matter. *See **Cooper Industries Inc. v. Leatherman Tool Group, Inc.***, 532 U.S. 424, 436 (2001) (holding that "courts of appeal should apply a *de novo* standard of review when passing on [trial] courts' determinations of the constitutionality of punitive damages awards.").

### A. Reprehensibility

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." ***Gore***, 517 U.S. at 575. This is because it "should be presumed [that] a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment and deterrence." ***State Farm***, 538 U.S. at 419. To determine the reprehensibility of a defendant's conduct, the High Court instructed lower courts to consider the following:

> [W]hether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

- 7 -

*Id.* The aforementioned factors must be weighed to determine whether a punitive damages award is sustainable. *See id.* ("The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect."). The trial court herein determined that the evidence presented in this case did "not support a finding of reprehensibility." Trial Court Opinion, 4/9/24, at 11. We disagree.

## 1. Physical or Economic Harm

In *Gore*, the United States Supreme Court explained that physical harm constituted an "aggravating factor" evidencing "particularly reprehensible conduct." *Gore*, 517 U.S at 576. Here, it is evident that Mr. Clemmons' harm was primarily physical in nature. The trial court explained:

> Immediately after the crash, [Mr. Clemmons] was able to exit his tractor[-trailer] to offer aid to [Mr.] Lehr who was also injured, talk to police for hours, drive his vehicle to check on his demolished trailer which had been relocated, and ultimately drive to and check into a local hotel. [Mr. Clemmons] did not receive medical care or go to a local hospital [immediately following the accident. Mr. Clemmons] described his condition as "confused," with the "adrenaline flowing," "a slight headache" and "[a] cut on his neck." The next day, still with "headaches and blurred vision[,]" [Mr. Clemmons] embarked on his 1,200 mile, nearly two day drive, on a broken and propped driver seat, back to his home in Florida. Once home, [Mr. Clemmons] still did not immediately seek medical care; but, finally, did so after experiencing difficulty in movement along with pain in his neck, back, arm and leg.
>
> At trial, four years later, [Mr. Clemmons] testified to continued pain in those areas along with headaches and short-term memory loss. [Mr. Clemmons] described himself as having good and bad days with pain levels ranging from [three] to

[eight]. Treatment has included radiofrequency abolition, PRN medication, and recommendation for surgery which [Mr. Clemmons] declined. While [Mr. Clemmons] is no longer able to drive a tractor-trailer or manage his trucking business, he is able to handle household duties, resume playing his favorite sport, golf, and play basketball with his sons.

Trial Court Opinion, 4/9/24, at 12-13.

Undoubtedly, Mr. Clemmons suffered a traumatic experience which resulted in lingering physical effects years later. This factor, therefore, weighs in favor of finding Ecore's conduct reprehensible. *See Cote v. Philip Morris USA, Inc.*, 985 F.3d 840, 847 (11th Cir. 2021) (holding that the first factor weighed in favor of finding reprehensibility because the plaintiff suffered "severe COPD caused by her addiction to cigarettes."); *see also Bell v. O'Reilly Auto Enters.*, LLC, 626 F. Supp. 3d 141, 180 (D. Me. 2022) (holding that the first factor weighed in favor of finding reprehensibility because the plaintiff's emotional harm manifested itself in physical symptoms, namely, his "painful" Tourette syndrome tics).[2]

**2. Indifference to or Reckless Disregard for the Safety of Others**

This factor focuses on whether the "tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others." *State Farm*, 538 U.S. at 419. In general, "conduct that risks harm to many is more reprehensible than conduct that risks harm only to a few." *Philip Morris USA v. Williams*, 549 U.S. 346, 357 (2007).

_____

[2] Our review of the instant matter revealed a limited amount of precedent within this Commonwealth addressing and applying the *Gore* guideposts. We therefore look to the application of other jurisdictions for guidance.

The evidence presented at trial demonstrated that Ecore, a flooring company, employed a fleet of approximately four tractor-trailers to drive a 30-to-45-minute commute from Lancaster, Pennsylvania to York, Pennsylvania, multiple times a day. In addition, Ecore's corporate representative, Jeremy Hinze, testified that Mr. Lehr was hired as a driver for Ecore in 2019, even though he did not have much, if any, prior experience. *See* N.T. Trial, 9/5/23, at 3; *see also* N.T. Trial, 9/5/23, at 179. At trial, Mr. Lehr admitted that, during his commute, he frequently traveled over the speed limit even though he was aware of the severe risk speeding posed to himself and others traveling on the road. *See* N.T. Trial, 9/5/23, at 147 and 159-161. In this same vein, Mr. Hinze admitted to his awareness of Mr. Lehr's habitual speeding, acknowledged the extreme risk this posed, and yet, was unable to definitively say whether he ever confronted Mr. Lehr about it. *See* N.T. Trial, 9/6/23, at 55-57; *see also id.* at 65-66. To the contrary, the only evidence of such a conversation indicated tolerance for Mr. Lehr's practice of speeding. *See* N.T. Trial, 9/5/23, at 167 (highlighting Mr. Lehr's testimony during his deposition in which he stated that Ecore knew that he "routinely d[rove] five to [10] miles an hour over the speed limit" and simply told him to "keep it [at a] reasonable [speed]."). Hence, the evidence presented at trial displayed Ecore's relaxed, casual, and even nonchalant attitude toward an inexperienced driver who frequently traveled over the speed limit, despite its awareness of the threat of harm it posed. In addition, Kirk Cummings, the Clemmons' Trucking Safety and Compliance expert, specifically testified that Mr. Lehr's

"excessive speed" significantly contributed to the accident. Video Deposition of Kirk Cummings, 8/30/23, at 42; *see also* N.T. Trial, 9/7/23, 96.

Contrary to the trial court's opinion, we do not believe that "this case involved [nothing more than a] series of unfortunate circumstances." Trial Court Opinion, 4/9/24, at 11. Rather, the accident herein was the inevitable result of Ecore's failure to ensure that its drivers, including Mr. Lehr, followed safety regulations and avoided the heightened risk speeding posed to other drivers. This failure displayed a conscious disregard of the risk Ecore's tractor-trailers posed to the safety of others. We therefore conclude that, while the circumstances leading up to the instant accident may have been unfortunate, that does not operate to minimize the risk posed by Ecore's lack of oversight of its drivers. Hence, this factor also weighs in favor of finding Ecore's conduct reprehensible. *See Quest Services Corp. v. Blood*, 252 P.3d 1071, 1095 (Co. 2011) (*en banc*) (noting that the plaintiff's accident "was compounded by a set of rare, or more precisely, unfortunate, circumstances but such "unfortunate circumstances" did not "minimize the risk posed by [the defendant's] . . . failure to implement . . . [an] inspection program." Because this failure "demonstrated a conscious disregard for the safety of others," the court weighed this factor in favor of a finding of reprehensibility.)

### 3. Financially Vulnerable Target

This factor is particularly relevant if the inflicted harm is purely economic in nature. *See Gore*, 517 U.S. at 576 (noting that the "infliction of economic injury, especially when done intentionally . . . or when the target is financially

vulnerable, can warrant a substantial penalty."). Hence, the Clemmons' financial state was largely irrelevant to the instant case and, therefore, this factor weighs against finding Ecore conduct was reprehensible.

### 4. Repeated Actions or Isolated Conduct

It is settled law that "repeated misconduct is [considered] more reprehensible than an individual instance of malfeasance." **Gore**, 517 U.S. at 577. Indeed, "[e]vidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." **Id.** at 567-577.

Here, Mr. Lehr admitted at trial that he frequently drove approximately five to 10 miles per hour over the speed limit. **See** N.T. Trial, 9/5/23, at 147 and 159-161. Moreover, the Clemmons presented evidence that, in the 30 days leading up to the accident, Mr. Lehr drove "in excess of 65 miles per hour" on his route on multiple occasions, even though the posted speed limit was only 55 miles per hour. **See** N.T. Trial, 9/6/23, at 55. Finally, Mr. Hinze admitted his awareness of Mr. Lehr's habit of speeding but could not remember whether he ever addressed it. **See id.** at 55-57. Again, it was determined at trial that speed played a significant role in the instant accident and that speeding in a tractor-trailer posed a serious risk. Video Deposition of Kirk Cummings, 8/30/23, at 42; **see also** N.T. Trial, 9/7/23, 96. We therefore conclude that, even though Ecore's drivers may not have had a history of accidents, the Clemmons demonstrated that Mr. Lehr repeatedly

engaged in the unlawful and unadvisable act of speeding while driving, and Ecore repeatedly failed to address it, even though both were aware of the extreme risk such conduct posed. "Such repeated misconduct jeopardized not just [Mr. Clemmons,] but the safety of . . . the public, and exemplifies the conduct of a repeat offender." *Quest Services Corp.*, 252 P.3d at 1096-1097 (holding that even though the defendant's behavior "only resulted in the injury to [the plaintiff, the] repeated conduct [was] still relevant in measuring the reprehensibility of [the defendant's] conduct."); *see also CGB Occupational Therapy v. RHA Health Services, Inc.*, 499 F.3d 184, 191 (3d Cir. 2007) ("[W]hile the repeated conduct [criterion] will necessarily have 'less force' where the defendant's misconduct did not extend beyond his dealings with the plaintiff, it may still be 'relevant' in measuring the reprehensibility of the defendant's conduct, based on the particular facts and circumstances presented.") (citation omitted). Thus, this factor weighs in favor of a finding of reprehensibility.

### 5. Intentional Malice, Trickery, or Deceit

The final *Gore* factor calls upon a court to explain whether the harm "was the result of intentional malice, trickery, [] deceit, or [a] mere accident." *State Farm*, 538 U.S. at 419. There is no evidence that Ecore engaged in acts of intentional malice, trickery or deceit. Hence, this factor appears to weigh against a finding of reprehensibility.

A balancing of these factors shows that three of the five factors weigh in favor of reprehensibility and, as such, indicate that Ecore's conduct was

reprehensible. Hence, we disagree with the trial court's conclusion that the evidence presented "does not support a finding of reprehensibility" to sustain the punitive damages award. Trial Court Opinion, 4/9/24, at 11. While this matter may not constitute the most egregious case, the determination that it involved nothing more than "unfortunate circumstances" is inconsistent with the evidence presented at trial. *Id.*

## B. Ratio Between Punitive Damages Award and Compensatory Award.

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is the ratio to the actual harm inflicted on the plaintiff[, which is expressed by the compensatory damages awarded]." *Gore*, 517 U.S. at 580. The United States Supreme Court, however, has consistently "decline[d]. . . to impose a bright-line ratio which a punitive damages award cannot exceed." *State Farm*, 538 U.S. at 425. Our Supreme Court commented on this refusal on the part of the United States Supreme Court as follows:

> The High Court [has] "rejected the notion that the constitutional line [of excessiveness] is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *Gore*, 517 U.S. at 582. In fact, the Court has remarked that "[i]n most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis." *Id.* at 583.
>
> Even taking into account the High Court's observation that a [four] to [one] ratio "might be close to the line of constitutional impropriety," *State Farm*, 538 U.S. at 425, we cannot escape the Court's steadfast refusal to create a bright line for

delineating excessive punitive awards. The fact is that—by definition—a guidepost is an "indication, sign," and is meant to direct courts toward a line of reasonableness, not dictate where the line is. There is no bright line because being close to the line is not synonymous with crossing it, let alone crossing it to the point of offending constitutional principles. According to the Supreme Court, the ratio of punitive damages to compensatory damages is "instructive," not binding, and the limits of a constitutionally acceptable ratio are defined by the facts of a particular case. ***Gore***, 517 U.S. at 583; ***see also State Farm***, 538 U.S. at 425 ("The precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.").

***Bert Co.***, 298 A.3d at 81–82 (parallel citations and footnotes omitted).

We note, however, that the United States Supreme Court most recently stated that "few awards exceeding a single-digit ratio between punitive damages and compensatory damages, to a significant degree, will satisfy due process." ***State Farm***, 538 U.S. at 425. In addition, the High Court noted: "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outmost limit of the due process guarantee." ***Id.***; ***see also id.*** at 426 (holding that the compensatory damages awarded to the plaintiffs, which amounted to $1,000,000.00 "was substantial" and provided "complete compensation."). Thus, our Supreme Court instructed that "a court should 'raise a suspicious judicial eyebrow' at a punitive damages award that does not bear a reasonable relationship to the harm." ***Bert Co.***, 298 A.3d at 82 (citation omitted).

Herein, the trial court noted that the "punitive damages award of [$25,000,000.00 was] approximately 21 times the amount of the compensatory verdict," resulting in a 21.67:1 ratio. Trial Court Opinion,

4/9/24, at 12 (citation omitted). Undoubtedly, a 21.67:1 ratio is far and above the single-digit ratio recommended by **State Farm** which, in turn, correctly "trigger[s] judicial suspicion." **Bert Co.**, 298 A.3d at 82. We, like the trial court, recognize that such a ratio is particularly problematic because Ecore's conduct, while sufficiently reprehensible, was not "particularly egregious" in that it did not act with intentional malice, trickery or deceit or otherwise intentionally seek to harm Mr. Clemmons. **State Farm**, 538 U.S. at 425 (quotation omitted); **Compare Bullock v. Philip Morris USA, Inc.**, 131 Cal. Rptr. 3d 382, 406 (Cal. Ct. App. 2011) (upholding $13.8 million punitive damages award even though the compensatory damages award was only $850,000.00 considering the extremely reprehensible degree of defendant's misconduct), and **Flax v. DaimlerChrysler Corp.**, 272 S.W. 3d 521, 540 (Tenn. Ct. App. 2008) (upholding $13 million punitive damages award even though the compensatory damages award was $2.5 million because a 1:1 ratio "would [not] adequately punish [] or deter" the defendant's reckless conduct). In light of the fact that "[o]ur case law makes it clear that punitive damages are an "'extreme remedy' available in only the most exceptional matters," we agree with the trial court's determination that the $25,000,000.00 punitive damages award, which is approximately 21 times the amount of the compensatory damages award, exceeds the bounds of constitutionality in this case. **Phillips v. Cricket Lighters**, 883 A.2d 439, 445 (Pa. 2005) (internal citations and footnote omitted); **see Bach v. First Nat'l Bank**, 486 F.3d 150, 156 (6th Cir. 2007) (holding that the facts of the

case were not "particularly egregious" to justify a "sizeable punitive damages award" and, as such, warranted a "ratio of 1:1 or something near to it.") (citations omitted); *see also Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005) (holding that the "[f]actors that justify a higher ratio, such as the 'presence of an injury that is hard to detect'" or "particularly egregious [conduct]" were "absent" thus, a "ratio of approximately 1:1 would comport with the requirements of due process.").

### C. Sanctions for Comparable Conduct

The third and final of the *Gore* guideposts measures the difference between the punitive damages award and the civil penalties for comparable misconduct. *See Gore*, 517 U.S. at 575 and 583; *see also State Farm*, 538 U.S. at 428 (limiting review to civil penalties only because criminal penalties have "less utility" when assessing "the dollar amount of the award."). As recognized by both parties, this guidepost "has little application to this case" because, at most, the conduct at issue could give rise to traffic citations. Clemmons' Brief at 48; *see also* Appellees/Cross-Appellants' Brief at 29. This recognition, while not wholly significant, reinforces our determination that the original $25,000,000.00 punitive damages cannot stand. *See Lompe v. Sunridge, LLC*, 818 F.3d 1041, 1073 (10th Cir. 2016) (explaining that its review of comparable cases did not "produce[] particularly robust comparisons" which "on the whole . . . reinforce[d its] assessment that the $22,500,000[.00] punitive damages award . . . was excessive.").

In summary, based upon our assessment of the **Gore** guideposts, we agree with the trial court that $25,000,000.00 punitive damages award raised constitutional concerns. While we disagree with the trial court's conclusion and hold that Ecore's conduct was, in fact, reprehensible, we agree that the original 21.67:1 ratio between the compensatory and punitive damage award, as well as a review of comparable civil cases, sufficiently tip the scales of justice to support a finding that the $25,000,000.00 punitive damages award was unconstitutionally excessive.

We now turn to the Clemmons' second appellate issue, in which they argue that the trial court abused its discretion in remitting the $25,000,000.00 punitive damage award to $1,000,000.00. This Court reviews an award of punitive damages, as well as a trial court's decision to remit such an award, for an abuse of discretion. **See Grossi v. Travelers Personal Ins. Co.**, 79 A.3d 1141, 1157 (Pa. Super. 2013); **see also Dubose v. Quinlan**, 125 A.3d 1231, 1244 (Pa. Super. 2015), *aff'd*, 173 A.3d 634 (Pa. 2017). Thus, the "grant or refusal of . . . remitter because of the excessiveness of the verdict . . . will not be reversed unless an abuse of discretion or error of law has been committed." **Dubose**, 125 A.3d at 1244.

In addressing this issue, we reiterate:

> Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either "the defendant's evil motive or his reckless indifference to the rights of others." A defendant acts recklessly when "his conduct creates an unreasonable risk of physical harm to another [and] such risk is substantially greater than that which is necessary to make his conduct

- 18 -

negligent." Thus, a showing of mere negligence, or even gross negligence, will not suffice to establish that punitive damages should be imposed. Rather, the plaintiff must adduce evidence which goes beyond a showing of negligence, evidence sufficient to establish that the defendant's acts amounted to "intentional, willful, wanton or reckless conduct[."]

*Phillips*, 883 A.2d at 445–446 (internal citations and footnote omitted). In addition, settled Pennsylvania law requires "the size of a punitive damages award [to] be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion." *Hollock*, 842 A.2d at 419 (citation omitted).

The trial court herein determined that, based upon the "interests of justice and constitutional considerations," it was "compelled" to remit the $25,000,000.00 punitive damages award to $1,000,000.00. Trial Court Opinion, 4/9/24, at 11. In so doing, the trial court emphasized that "[t]he punitive damages award of [$25,000,000.00] 'is approximately 21 times the amount of the aggregate compensatory verdict[] and 50 times the $500,000.00 awarded to [Mr.] Clemmons alone.'" *Id.* at 12 (citation omitted). Because it considered the above ratio to be "grossly excessive," the trial court opined that a "more acceptable multiplier . . . [was] in the single digits." *Id.* (citation omitted). Accordingly, in remitting the punitive damages award, the trial court determined that "the reduction to a multiplier of **two** [] to [$1,000,000.00]" was more appropriate. *Id.* (emphasis added).

It is apparent that, upon remitting the punitive damages award to $1,000,000.00 and subsequently opining that, in so doing, it was imposing a ratio of 2:1, the trial court only considered the compensatory damages awarded to Mr. Clemmons. **See id.** at 12 (noting that the jury awarded "$500,000.00 to Mr. Clemmons alone" and that a "multiplier of **two**" to $1,000,000.00 was appropriate). In so doing, the trial court erroneously inflated the ratio of the remitted punitive damages because it ignored the compensatory damages awarded to Mrs. Clemmons which totaled $700,000.00. A review of relevant case law demonstrates that, if a compensatory damage award includes recovery for a claim of loss of consortium, a court must consider the **entire** compensatory award when assessing the ratio between the compensatory and punitive damages awards. **See Axen v. American Home Products Corp.**, 974 P.2d 224, 322 n.26 (Or. App. 1999) ("Although punitive damages were sought and awarded to [husband-plaintiff] alone, the harm caused by [the defendant's] conduct includes the $500,000[.00] in non[-]economic damages suffered by [wife-plaintiff] for loss of consortium. Hence, [wife-plaintiff's] damages should be included in the calculation of the ratio between compensatory and punitive damages in this case."); **see also Fraser v. Wyeth, Inc.**, 992 F. Supp. 2d 68, 100 (D. Conn. 2014) (assessing the ratio between the entire compensatory damages award and the punitive damages award even though the plaintiff's wife's recovery was rooted in loss of consortium); **Smith v. Ingersoll-Rand Co.**, 214 F.3d 1235, 1252-1254 (10th Cir. 2000) (noting that

the compensatory award included $1,000,000.00 that was "apparently attributable to [wife-plaintiff's] loss of consortium" and subsequently including it in the total compensatory damages award, totaling $9,808,661.00, to assess the ratio between compensatory and punitive damages).

We therefore conclude that, by considering only the compensatory damages awarded to Mr. Clemmons, and failing to consider the entire compensatory damage award, the trial court committed an error of law. We believe, however, that it is most appropriate to remand the instant matter to allow the parties to address this particular issue, *i.e.*, the appropriate punitive damages award based upon a proper multiplier, before the trial court.[3]

_____

[3] In reaching this conclusion, we necessarily reject Ecore's request on appeal to remit the punitive damages to $500,000.00, *i.e.*, "the amount of the compensatory damages awarded to [Mr. Clemmons]." Appellees/Cross-Appellants' Brief at 36. Ecore argues that, because punitive damages were awarded to Mr. Clemmons alone, this Court should only consider the compensatory damages, $500,000.00, awarded to him because such an award would result in a one to one ratio. *Id.* We note, initially, that Ecore cites no case law that directly supports its proposition. Instead, it simply contends that, when a compensatory award is considered substantial, a 1:1 ratio should be implemented. *See id.* at 37 (citing cases which considered a compensatory damages award "substantial" and, as such, reducing the punitive damages award to reflect a 1:1 ratio). More importantly, however, in lodging this request, Ecore discounts the nature of a loss of consortium claim. A loss of consortium claim is derivative in nature because the "consortium plaintiff . . . has suffered no direct injury." *Scattaregia v. Shin Shen Wu*, 495 A.2d 552, 554 (Pa. Super. 1985) (citation omitted). Rather, her "right to recover is derived, both in a literal and legal sense, from the injury suffered by [her] spouse." *Id.* (citation omitted). Because the "consortium claim and the personal injury claim are closely interconnected; **they represent the total, compensable damages** – direct and indirect – suffered as a result of the principal plaintiff's injury." *Id.* (citation omitted) (emphasis added).

- 21 -

## LEHR AND ECORE'S APPELLATE ISSUES

We will now consider the claims raised by Mr. Lehr and Ecore on appeal. We note, however, that our discussion above disposed of their first two issues on appeal. ***See***, ***supra***; ***see also*** at n.3.  Hence, we need only address Mr. Lehr's and Ecore's contention that they are entitled to JNOV on the Clemmons' punitive damages clam.

This Court previously stated:

> The proper standard of review for an appellate court when examining the lower court's refusal to grant a [JNOV] is whether, when reading the record in the light most favorable to the verdict winner and granting that party every favorable inference therefrom, there was sufficient competent evidence to sustain the verdict.  Questions of credibility and conflicts in the evidence are for the trial court to resolve and the reviewing court should not reweigh the evidence.  Absent an abuse of discretion, the trial court's determination will not be disturbed.
>
> JNOV is an extreme remedy, as the trial court "cannot lightly ignore the findings of a duly selected jury."  A motion for JNOV challenges the sufficiency of the evidence presented at trial.  As such, JNOV is only proper where, when viewing the evidence in the light most favorable to the verdict winner, the facts are so clear that reasonable minds could not disagree that the verdict was improper.  JNOV . . .  may not be employed to invade the province of the jury. …  Thus, where the jury has been presented with conflicting evidence, a motion for JNOV should be denied.

***Koller Concrete, Inc. v. Tube City IMS, LLC***, 115 A.3d 312, 320–321 (Pa. Super. 2015) (internal citations omitted) (format altered).

Importantly,

> in Pennsylvania, a punitive damages [award] must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to

which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk.

***Snead v. Soc'y for Prevention of Cruelty to Animals of Pennsylvania***, 929 A.2d 1169, 1184–1185 (Pa. Super. 2007), *aff'd*, 985 A.2d 909 (Pa. 2009) (quotation marks omitted).

As we discussed thoroughly above, the Clemmons presented evidence at trial demonstrating Mr. Lehr's and Ecore's combined awareness of the risk that speeding while driving a tractor-trailer posed to others. In this same vein, the Clemmons presented evidence showing that Mr. Lehr and Ecore, on numerous occasions, consciously and repeatedly disregarded this risk. The trial court, in rejecting Mr. Lehr's and Ecore's claim regarding JNOV, largely relied upon the same evidence we highlighted above. ***See*** Trial Court Opinion, 4/9/24, at 4-8. Accordingly, for the reasons we conclude the conduct at issue rose to the level of reprehensibility, we reject Mr. Lehr and Ecore's request for a JNOV on the Clemmons' punitive damages award.

Judgement affirmed, in part, vacated, in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/27/2026